```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF PUERTO RICO
```

Francisco J. Reyes Caparrós

    v.                          Civil No. 15-cv-2229-JNL
                                     Opinion No. 2019 DNH 070
William P. Barr, Attorney General
of the United States

**MEMORANDUM ORDER**

In this employment action against a federal-government employer, the defendant's motion for judgment as a matter of law or a new trial turns on whether the plaintiff, Francisco Reyes Caparrós, engaged in, or was perceived to have engaged in, activity protected by Title VII of the Civil Rights Act and whether his former employer, the United States Attorney's Office for the District of Puerto Rico, retaliated against him for that activity by creating a hostile work environment.

Reyes served as an Intelligence Specialist at the USAO from 2009 until his resignation in February 2015. He then filed this lawsuit under Title VII of the Civil Rights Act, see 42 U.S.C. § 2000e-16(a), claiming that his supervisors at the USAO retaliated against him by creating a hostile work environment for engaging in three instances of protected activity: (1) supporting an Assistant United States Attorney ("AUSA"), who herself had employment-related claims against the office, by obtaining a ballistics vest for her in February 2012, (2) filing

a complaint with the Equal Employment Opportunity ("EEO") office of the Department of Justice in November 2013, see 29 C.F.R. § 1614.106(a), and (3) filing a second complaint with the EEO office in November 2014.

After a three-week trial, the jury returned a verdict in Reyes's favor and awarded him $300,000 in damages.[1] At the appropriate times, the defendant USAO moved for judgment as a matter of law. See Fed. R. Civ. P. 50(a). The court took that motion under advisement. (As explained infra, however, these timely motions did not contain some of the arguments it later asserted in the present motion.) The USAO has now moved anew for judgment as a matter of law or a new trial, arguing that the court erred through: (1) instructing the jury on the perception theory of retaliation under 42 U.S.C. § 2000e-16(a); (2) instructing the jury and permitting an advisory verdict on constructive discharge; (3) giving a limiting instruction after the plaintiff testified about, and his counsel referenced, issues arguably excluded by the court's pre-trial order on motions in limine; and (4) declining to adopt the defendant's construction of the national-security exception to Title VII.

The court denies the defendant's motion in its entirety. It instructed the jury consistent with 42 U.S.C. § 2000e-16(a),

---

[1] Jury Verdict (doc. no. 222).

2

in no way prejudiced the defendant by permitting an advisory verdict on what is ultimately an issue reserved for the court, properly instructed the jury to limit its consideration of evidence concerning other employees' claims against the USAO and attorney argument on the subject, and correctly declined to adopt an eleventh-hour interpretation of the national-security exception that was inconsistent with the plain text of that statute.

## I. Applicable legal standard

### A. Judgment as a matter of law.

"Under Federal Rule of Civil Procedure 50, the court may grant judgment as a matter of law to a party on an issue if 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue.'" T G Plastics Trading Co. v. Toray Plastics (Am.), Inc., 775 F.3d 31, 37 (1st Cir. 2014) (quoting Fed. R. Civ. P. 50(a)(1)). "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005) (internal quotations omitted). To determine whether this standard is met, the court "examine[s] the evidence in the light most favorable to the non-moving

party," Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994), and affords that party "the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn," Cochrane v. Quattrocci, 949 F.2d 11, 12 n.1 (1st Cir. 1991).

### B.   New trial

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "In effect, that rule authorizes a district court to override a jury verdict and order a new trial 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" Teixeira v. Town of Coventry, 882 F.3d 13, 16 (1st Cir. 2018) (quoting Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006)). As concerning most of the defendant's challenges here, "[a]n erroneous jury instruction, warrants a new trial if 'the preserved error, based on a review of the entire record, can fairly be said to have prejudiced the objecting party.'" Goodman v. Bowdoin Coll., 380 F.3d 33, 47 (1st Cir. 2004) (quoting Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 135 (1st Cir. 1997)).

4

The following recitation of facts takes this approach, drawing on the trial evidence.

## II. __Background__

Reyes was employed by the USAO for the District of Puerto Rico for almost six years, from May 24, 2009 until he resigned on February 3, 2015.[2]  Throughout his tenure, he held the position of Intelligence Specialist, which, according to the job description, "performs a range of intelligence, investigative, advisory, security and training duties in support of the national security and counter-terrorism responsibilities of the USAO and Department of Justice," often in coordination with other agencies and organizations such as the FBI.[3]  Because these responsibilities required access to classified information, Reyes held a "Top Secret/Sensitive Compartmented Information" ("TS/SCI") security clearance.[4]  He was also afforded access to certain physical spaces controlled by the FBI in connection with these duties.[5]

---

[2] Stipulated Facts (doc. no. 194) ¶ 1.

[3] Trial Ex. 2 at D2706.

[4] See Stipulated Facts (doc. no. 194) ¶ 5.

[5] See May 23, 2018 Tr. at 74-75, 116.  The plaintiff observes that the defendant failed to include, attached to his motion, relevant portions of the trial transcripts on which he relied. See Plaintiff's Obj. (doc. no. 240) at 3-4.  The plaintiff does not appear to have ordered the transcripts nor requested any relief from the court (except denial of defendant's motion) to

During this time, Reyes also served as the Assistant District Office Security Manager for the USAO, reporting in that role to Lisa Western, the District Office Security Manager. Throughout his employment at the USAO, its executive management team consisted of the United States Attorney ("USA"), Rosa Emilia Rodríguez, the First Assistant United States Attorney ("FAUSA"), María Domínguez, and AUSA Jacqueline Novas, who served as Special Counsel to the United States Attorney.[6]

## A. Ballistic-vest incident

The story that ultimately led Reyes to resign from his position, and to this action, begins on November 22, 2011, when AUSA Idalia Mestey sent an email to Reyes's supervisor, Office Security Manager Western, to the effect that "either a bullet or a dynamite 1/4 was aimed at me tonight."[7] She testified that, while walking in Old San Juan, she heard a loud sound that a witness identified as a gunshot. Several months later, on February 10, 2012, AUSA Mestey forwarded additional information

---

[6] Id. ¶ 3. When the court refers to the "management team," "management," or "Reyes's supervisors," it refers to these individuals.

[7] Trial Ex. 19 at D4443.

obtain those transcripts. And after the defendant attached relevant portions to its reply, the plaintiff did not file or seek leave to file a surreply, or any other opportunity to address them.

6

about the incident to Reyes.[8] She elaborated on the fact that she was, at the time, prosecuting a felon in possession of a firearm charge against a defendant with a lengthy criminal history.[9] One of the witnesses, a police officer, had been murdered that December and the "state DA's sister" was also murdered shortly after a hearing in an underlying state prosecution.[10] As a result, Mestey concluded that the sound she heard in Old San Juan in November "may have been related to those seemingly surrounding [that] case."[11]

In February, Reyes called the Security Staff at the Executive Office for United States Attorneys ("EOUSA") to report that AUSA Mestey had received a death threat. He subsequently sent an Urgent Report to the Security Staff that lacked any explicit mention of a death threat but implied potential danger to AUSA Mestey and AUSA Jose Capo, who also worked on the case, because they were prosecuting a violent defendant.[12] The Security Staff provided ballistic vests for both AUSAs.[13] This

---

[8] Id. at D4442-43.

[9] Id. at D4443.

[10] Id.

[11] Id. at D4442 (emphasis in original).

[12] Trial Ex. 20.

[13] Trial Exs. 17, 18.

7

sparked some discussion among the USAO management team over the Urgent Report[14] and, after the ballistic vests arrived, over whether the vests were actually necessary.

On February 14, 2012, Reyes was called into a management-related meeting attended by at least USA Rodríguez, FAUSA Domínguez, and AUSA Capo (who, Reyes testified, was wearing his ballistic vest). According to Reyes, USA Rodríguez chastised him for providing a ballistic vest to AUSA Mestey and, citing another AUSA in the office, told him that he should be aware of who the "crazies" in the office were.

Reyes testified that FAUSA Domínguez then pulled him outside of the conference room and explained to him that AUSA Mestey "had a complaint" against the office and that giving her a vest "would make her look like a victim."[15] Reyes reportedly responded that, if AUSA Mestey indeed was "crazy," then the FBI, after investigating, would discover that her complaint about being in danger lacked merit.[16] Failing to investigate or provide the ballistic vest to AUSA Mestey (a person with an

---

[14] Trial Ex. 22 at P0220.

[15] May 29, 2018 Tr. at 98-99. FAUSA Domínguez testified that she held no such conversation with Reyes. May 21, 2018 Tr. at 167.

[16] May 23, 2018 Tr. at 96.

8

employment complaint against the USAO), he reportedly explained, would be discriminatory.[17]

Reyes alleged that his supervisors perceived his actions as supporting an EEO complaint previously filed by AUSA Mestey. Though personally unaware of that complaint prior to the February 14 meeting,[18] he alleged that FAUSA Domínguez referred to it when she referenced a "complaint" in the hallway conversation after the meeting.

## B.    First period of alleged retaliation

After the incident with the ballistic vest, Reyes testified, he "fell from grace" and had a "target on his back."[19] During the months following the incident, he contends that Western, at USA Rodríguez's request, micromanaged him in ways she previously had not.  For example, she newly required him to obtain prior approval to attend meetings on behalf of the office.  She also began asking for status updates and asking him to account for his time.  His office was moved from the 16th floor, near the executive suite — that is, where the USA, FAUSA, and other members of the management team were located — to the

---

[17] Id.

[18] May 29, 2018 Tr. at 67, 98.

[19] Id. at 69; May 23, 2018 Tr. at 161.

9

14th floor.  After the move, he testified, Western often walked past his door without any explanation.

In September 2013, over a year after the ballistic-vest incident, Reyes received a reprimand for posting an unflattering photograph of one of the security guards that he supervised. Later that month, during a September 30, 2013, all-hands (i.e., full staff) meeting, USA Rodríguez referred to him in front of the entire gathered staff as "the person that nobody likes."[20]

### C.    The FBI investigation

On October 2, 2013, two FBI agents interviewed Reyes.  The previous month, he had received an email from a friend inviting him to attend a "Generation Next Program" in Russia, sponsored by the Russian Cultural Centre in the United States.[21]  The FBI agents expressed concern to USA Rodríguez that the "cultural exchange" trip was sponsored by an organization led by a known Russian spy and that the purpose of the trip was to recruit the invitees for espionage purposes.  After the FBI interviewed

---

[20] USA Rodríguez testified that she did so "[b]ecause everybody liked him," and to "break the mood" because those at the meeting "had very long faces" in light of the upcoming furlough. May 23, 2018 Tr. at 7-8.

[21] Reyes forwarded the invitation to Western, stating:  "I know for my clearance that [I] have to get some permissions [if I] want to attend but I never done [sic] this in our office before so I don't know where to go or who to ask . . . ."  Trial Ex. 27 at D3699.

10

Reyes, the Special Agent in Charge of the FBI's San Juan Office informed USA Rodríguez that Reyes "will not have access to FBI space including meetings held for the Joint Terrorism Task Force," and asked that the USAO "refrain from disseminating to Mr. Reyes the contents of any information and/or documents related to FBI criminal or national security investigative matters, until further notice."[22]  Because Reyes could no longer perform his duties without access to FBI materials, USA Rodríguez placed him on a sequestration-related furlough.[23]

The FBI began a formal investigation into Reyes on October 3, 2013.  The DOJ's Office of the Inspector General (OIG) began its own investigation into Reyes's conduct not long thereafter.  One year later, on September 4, 2014, the OIG concluded its investigation and issued a report finding that Reyes "used poor judgment by failing to perceive the national security implications of accepting a trip to Russia," especially in light of his background as an intelligence specialist.[24]

---

[22] Trial Ex. 33.

[23] The federal government shut down in the fall of 2013.  Many federal employees nationwide were furloughed between October 1 and October 16.  The plaintiff had not initially been included among that number.

[24] Trial Ex. 324 at D3359.

### D. Reyes's EEO complaints

On November 29, 2013, Reyes filed the first of two administrative complaints with the EEO. He alleged that he had engaged in activity protected by Title VII when he obtained a ballistic vest for AUSA Mestey in February 2012 and that he suffered various forms of retaliation following that event.[25] He filed a second EEO complaint on November 28, 2014, alleging that the management team retaliated against him for filing his first EEO complaint. Among other things, he claimed that the USAO continued to create a hostile work environment for him by: (1) suspending him for lack of candor and negligent performance of an assignment to collect and present statistics related to firearms cases prosecuted by the USAO; (2) reprimanding him for gossiping, (3) moving him to the Social Security Administration offices to assist with Social Security-related cases, (4) requiring him to document his medical appointments, and (5) denying his request for immediate reinstatement of his Intelligence Specialist duties.

### E. Resignation

On January 22, 2015, Reyes asked to have his duties as an intelligence specialist reinstated.[26] USA Rodríguez responded

---

[25] See Trial Ex. 54.

[26] Trial Ex. 115 at D2029.

12

that she could not reinstate those duties "at this time" because the USAO was "still in the process of determining whether [he] can perform the full range of duties that would be required of [him]" in that role.[27]  Those duties were suspended during the OIG and FBI investigations in light of Reyes's restricted access to confidential materials.  Though the Department of Justice never revoked Reyes's security clearance, the FBI continued to restrict his access to "their space."

Reyes resigned on February 3, 2015.  In his resignation letter, he identified several incidents that led to this decision, including the "unfounded" FBI and OIG investigations.  He also amended his EEO complaint to include allegedly-retaliatory actions, not recounted here, that occurred after he filed his 2014 EEO complaint.

In July and August 2015, the Complaint Adjudication Office of the United States Department of Justice issued Final Agency Decisions on both of Reyes's EEO complaints, finding no retaliation.  Reyes then timely initiated this lawsuit.

## F.  Pretrial litigation

After the close of discovery, the defendant moved for summary judgment, arguing that (1) Reyes engaged in no activity protected by Title VII before filing his first EEO complaint in

---

[27] Id. at D2028.

13

November 2013; and (2) none of his supervisors' actions after November 2013 constituted retaliation.[28] The USAO did not raise, at that time, several of the purely legal issues raised in this motion, including:

- Whether the anti-discrimination provision of Title VII applicable to the federal government protects employees from retaliation for engaging in opposition activity;

- Whether the perception theory operates to expand the government's waiver of sovereign immunity under Title VII; and

- Whether the national-security exception to Title VII precluded certain actions by the FBI and the USAO from being considered retaliatory.

The court denied that motion from the bench[29] and the case proceeded to trial.

Both parties moved in limine to exclude or admit certain evidence in advance of trial. Relevant to this motion, the defendant moved to exclude evidence concerning:

- Allegations of discrimination or retaliation by other USAO employees;[30]

- Revocation, or investigation into revocation, of Reyes's security clearance;[31]

---

[28] See Mem. in Supp. of Summary Judgment Mot. (doc. no. 56-1).

[29] See Summary Judgment Hrg. Tr. (doc. no. 119).

[30] Doc. no. 123.

[31] Doc. no. 125.

- Any of the defendants' allegedly retaliatory conduct that occurred before Reyes's November 2013 EEO complaint;[32]

- Reyes's requests for equitable relief in the form of backpay and front pay;[33]

The court issued a written order on these and several other motions.[34]

As permitted by the court,[35] the USAO also filed an ex parte memorandum in support of its expected Rule 50 motion at the beginning of the trial.  In accordance with this court's practice,[36] that motion was unsealed and provided to plaintiff's counsel at the close of the plaintiff's case in chief, who was then afforded an opportunity to object.[37]

---

[32] Doc. no. 127.

[33] Doc. no. 128.

[34] See Order on Mots. in Limine (doc. no. 168).

[35] See Final Pretrial Order (doc. no. 174) ¶ 21.  The purpose of this practice, employed frequently by this court in jury trials, is to apprise the court, in advance, of the specific grounds and arguments the parties expect to advance under Rule 50 later in the trial.

[36] See id.

[37] Though the defense provided a paper copy of its memorandum to the plaintiff's counsel after the plaintiff rested his case, see May 29, 2018 Tr. at 107, the electronic version remained inadvertently sealed for several months thereafter.  The court afforded the plaintiff an opportunity, which the plaintiff did not take, to seek relief after unsealing it on the docket.  See Order of February 27, 2019 (doc. no. 244).

**G.    Trial**

This extended litigation finally culminated in an 11-day trial.  The parties collectively called 18 witnesses, including Reyes, USA Rodríguez, FAUSA Domínguez, and AUSAs Capo, Novas, Mestey, Márquez, and Pérez.

At the close of the plaintiff's case and again at the close of evidence the defendant moved for judgment as a matter of law under Rule 50, raising several, but not all, of the arguments previewed by its memorandum.[38]  The court took that motion under advisement.

After distributing draft jury instructions to counsel, the court held a charge conference in chambers on the afternoon of the ninth day of trial, before the close of evidence.  The court and counsel discussed the appropriate instruction on Title VII retaliation.  It is the court's recollection that, after the

---

[38] In addition to the perception-theory and temporal-proximity arguments addressed in this order, the USAO also argued in its pretrial memorandum that the evidence would not support a finding that Reyes's employer took adverse employment action against him in retaliation for his EEO complaints filed in November 2013 and 2014.  See Defendant's Anticipated Rule 50 Mot. (doc. no. 195) at 5-11.  The USAO did not raise this argument upon moving for judgment as a matter of law at the end of the plaintiff's case or at the end of the evidence.  Failure to raise an issue in a pre-verdict motion for judgment as a matter of law renders it waived.  See Full Spectrum Software, Inc. v. Forte Automation Sys., Inc., 858 F.3d 666, 674 (1st Cir. 2017).  In any event, the USAO has not raised the issue in its post-trial motion for judgment as a matter of law or a new trial.

16

court revised its proposed instruction based on that discussion, the defendant's counsel did not object to the instruction except, generally, to the inclusion of an instruction on the perception theory. The record does not reflect any such objection, however.

The court and counsel also discussed whether to instruct the jury and obtain an advisory verdict on constructive discharge — an issue it had raised with counsel before that conference. The defendant never objected on the record to an advisory verdict on constructive discharge. In fact, the defendant never objected on the record to any of the jury instructions — either before or after they were given.

Before the court ruled on the defendant's oral motion for judgment as a matter of law, the USAO filed a new motion for judgment as a matter of law and a new trial, see Fed. R. Civ. P. 50(b), raising some of the issues address in its Rule 50 motion at trial and other, completely new issues.[39] Specifically, before its Rule 50 motion filed over three months after trial on September 7, 2018, the defendant had never argued:

---

[39] See Defendant's Mot. (doc. no. 236).

- that Title VII's anti-retaliation provision for federal-sector employees, 42 U.S.C. § 2000e-16(a), does not cover opposition activity;[40]

- that the statutory language of Title VII precludes the perception theory or that instructing the jury on that theory would "dramatically expand[ ] Title VII liability against the government";[41] or

- that he understood constructive discharge to be completely removed from the case.[42]

And though the USAO did argue (albeit only at the close of the plaintiff's case) that the national security exception to Title VII precluded the jury from considering as retaliation the FBI's limitations on Reyes,[43] it never moved for summary judgment on that purely legal issue, or moved in limine or during trial to limit evidence on that front, and never requested (or objected to the absence of) a limiting instruction on the subject.

Though the court could thus reject the majority of the defendant's arguments as waived, see Full Spectrum, 858 F.3d at 674, for the sake of completeness, the court addresses all of the defendant's arguments below.

---

[40] See Defendant's Mem. (doc. no. 237) at 6-7.

[41] See id. at 8-10.

[42] See id. at 14-16.

[43] See id. at 21-25.

## III. <u>Analysis</u>

The USAO raises four arguments in its new motion.  None of them entitle the defendant to judgment as a matter of law or a new trial.

**Perception theory.**  The court's jury instruction on perception theory does not entitle the USAO to such relief because, even if the federal-sector provisions of Title VII did not protect opposition activity (which they do), the parties operated through trial on the assumption that 42 U.S.C. § 2000e-3(a) governed Reyes's claim.  And though the First Circuit Court of Appeals has not expressly adopted the perception theory of retaliation under that provision, it has not expressly rejected the theory, which comports with the statutory language.  Nor has the Supreme Court or any other court of appeals expressly rejected it.  And finally, the plaintiff introduced evidence from which a reasonable jury could conclude that, having perceived protected activities on Reyes's part, his supervisors took retaliatory actions not too temporally distant to form a causal connection.

**Constructive discharge.**  Nor does the court's instruction on constructive discharge or the jury's advisory verdict warrant relief for the USAO.  It failed to preserve the issue and, further, was not prejudiced by it because it was on notice of the relevance of evidence concerning the circumstances of

19

Reyes's departure to Reyes's retaliation claim.  In any event, the court's anticipated evidentiary hearing on Reyes's claim for equitable relief in the form of backpay and front pay alleviates any prejudice arising from the defendant's decision not to put on certain evidence related to Reyes's departure and entitlement to those remedies.

**Other employees' allegations.**  The defendant's failure to timely object or seek any relief when the defendant testified in arguable contravention of the court's order on motions in limine likewise precludes relief based on that issue.  And, in light of all of the evidence of alleged retaliation presented, the court's limitation on former AUSA Nelson Pérez-Sosa's retaliation-related testimony — and the defendants' cross-examination as a result — does not entitle the defendant to a new trial or judgment as a matter of law.

**National-security exception.**  Finally, even if the national security exception to Title VII applied to the facts of this case (and on its face it does not), the defendant failed to request an instruction limiting the jury's consideration of the FBI's limitations on Reyes under that exception and, accordingly, is not entitled to relief because one was not given.

## A.    Perception theory of retaliation

It is unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  These types of activities have been characterized, respectively, as "opposition activity" and "participation activity."  Ray v. Ropes & Gray LLP, 799 F.3d 99, 107 (1st Cir. 2015).

In addition to claiming that Reyes's superiors retaliated against him for participation activity — filing two EEO complaints — Reyes also predicated his Title VII claim on the theory that his superiors retaliated against him for behavior that they <u>perceived</u> to oppose their treatment of another employee AUSA Idalia Mestey.  As the court instructed the jury, in relevant part:

> Reyes does not claim that, in procuring a ballistics vest for AUSA Idalia Mestey in February 2012, he engaged in actual protected opposition activity.  That is, he does not claim that he was actually assisting or supporting AUSA Mestey in her complaint to the Equal Employment Opportunity ("EEO") office of the Department of Justice by procuring a ballistics vest for her.  He contends, instead, that his supervisors at the United States Attorney's Office perceived this action as Reyes opposing their negative treatment of AUSA Mestey in retaliation for her filing an EEO complaint.  Under this perception theory, a plaintiff

21

can show retaliation based on his employer's mistaken belief that he engaged in protected activity.

Thus, in order to conclude that Reyes's action in procuring a ballistics vest for AUSA Mestey was protected activity, you must find that his superiors at the United States Attorney's Office perceived that action as opposing their treatment of AUSA Mestey based on her filing an EEO complaint. That is, you must find that members of the AUSA management team knew or reasonably believed that Reyes was assisting or supporting AUSA Mestey in her EEO complaint by procuring a ballistics vest for her.[44]

The defendant now argues that the court erred by instructing the jury that it could find for Reyes if it concluded that management perceived him as engaging in protected activity, even if he did not actually engage in such activity. Specifically, the defendant argues that (1) the federal-sector provisions of Title VII do not protect opposition activity at all; (2) even if the private-sector provisions of Title VII apply in this case, the court erred by instructing the jury about the "perception theory" of protected activity; and (3) even if the court correctly instructed the jury, any allegedly retaliatory actions were so temporally removed from any perceived, protected activity that the defendant is entitled to judgment as a matter of law. The court disagrees on all points.

As an initial matter, all of these arguments — and especially the last of them — are rendered moot by the verdict

---

[44] Final Jury Instructions (doc. no. 218) at 12-13.

form and the defendant's failure to object to it.[45]  The jury was first asked whether "Reyes's supervisors perceived him as engaging in protected activity when he procured a ballistics vest for AUSA Idalia Mestey in February 2012."[46]  It was then asked, in the next two questions, whether Reyes engaged in protected activity when he engaged in the EEO complaint process in 2013 and 2014.[47]  After resolving those three questions, the jury was asked a single time whether it found that "Reyes has proven, by a preponderance of the evidence, that his supervisors at the United States Attorney's Office retaliated against him for engaging in protected activity."[48]  Given this format, the jury could reasonably have concluded that Reyes's superiors retaliated against him for engaging in what the USAO concedes amounts to protected activity (so long as it is undertaken in good faith):  participation in the EEO process.

### 1.  Federal-sector Title VII

First, the USAO argues that the federal-sector provisions of Title VII do not protect opposition activity at all.  Even if

---

[45] Though the defendant did propose an alternative verdict form (doc. no. 219), he did not object to the final verdict form, which departed from his proposal.

[46] Verdict (doc. no. 222) at 2.

[47] Id.

[48] Id. at 3.

it had preserved this argument — which it did not, thus waiving it, see Full Spectrum, 858 F.3d at 674 — it offers no supporting authority and all courts of appeals that have addressed the question have concluded otherwise.

Specifically, the defendant observes, for the very first time in this action, that the provisions of Title VII applicable to employees of the federal government require only that "[a]ll personnel actions affecting employees . . . shall be made free from discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Section 2000e-16(a) contains no anti-retaliation provision, like that applicable to private-sector employees under § 2000e-3(a). Accordingly, the defendant argues, Title VII does not protect against employees of the federal government from retaliation for either participation or opposition activity. And, the defendant now contends, the court erred by "tether[ing] the perception theory to § 2000e-3(a)'s language regarding private-sector 'opposition activity'."[49] This argument runs directly contrary to established authority in this Circuit and the defendant's positions taken throughout this action.

While it is true that "Title VII does not contain an express antiretaliation provision applicable to the federal

---

[49] Defendant's Mem. (doc. no. 237) at 7.

24

government as employer," the First Circuit Court of Appeals has "assumed that the antiretaliation provision applicable to private employers operates to prohibit retaliation in the federal sector."[50] Morales-Vallellanes v. Potter, 605 F.3d 27, 35-36 (1st Cir. 2010); see also Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir. 2011). As the USAO acknowledges in its reply, the Court of Appeals in that case declined to decide whether Title VII allows federal-sector retaliation claims. Morales-Vallellanes, 605 F.3d at 35-36.

On the other side of that coin, the defendant has cited no authority from any court of appeals holding that federal employees may not bring retaliation claims under either § 2000e-3(a) or § 2000e-16. The court has found no such authority. To the contrary, every circuit court of appeals has applied the private-sector anti-retaliation provision to retaliation claims against the federal government. Some have expressly held that "the anti-retaliation standard that applies to private employees also applies to federal employees." Caldwell v. Johnson, 289 F. App'x 579, 588-90 (4th Cir. 2008); see also Brazoria Cty., Tex. v. E.E.O.C., 391 F.3d 685, 690 (5th Cir. 2004) ("In short,

---

[50] The court expresses its disappointment that the defendant's able and thoughtful counsel failed to cite or distinguish this clearly relevant authority in the defendant's opening memorandum.

§ 2000e-16 bars retaliation."); Ayon v. Sampson, 547 F.2d 446, 449 (9th Cir. 1976) ("Congress, in enacting 42 U.S.C. § 2000e-16 and thereby extending the equal employment opportunity provisions of the Civil Rights Act to federal employees, intended to include the protections from harassment and retaliation embodied in the Civil Rights Act.") Others have merely assumed as much. See Mathirampuzha v. Potter, 548 F.3d 70, 74 n.3 (2d Cir. 2008) ("We note that we have previously assumed without analysis that Congress extended Title VII's prohibition on retaliation to the federal sector"); Wadhwa v. Sec'y, Dep't of Veterans Affairs, 505 F. App'x 209, 213 (3d Cir. 2012) (analyzing federal employee's Title VII retaliation claim under § 2000e-3(a) framework); Taylor v. Geithner, 703 F.3d 328, 335 (6th Cir. 2013) (applying § 2000e-3(a)'s prohibitions to federal employer); Hale v. Marsh, 808 F.2d 616, 619 (7th Cir. 1986) (analyzing retaliation against federal employer under § 2000e-3(a), observing that § 2000e-16 "has been interpreted to incorporate" § 2000e-3(a)); Brower v. Runyon, 178 F.3d 1002, 1005 (8th Cir. 1999) (applying § 2000e-3(a) prohibitions to federal employer); Bd. of Cty. Comm'rs, Fremont Cty., Colorado v. U.S. E.E.O.C., 405 F.3d 840, 845 (10th Cir. 2005) (describing it as "well-settled that retaliation claims were actionable against the federal government under Title VII even though § 2000e-16 . . . did not specifically create a cause of action

26

for retaliation."); Putman v. Sec'y, Dep't of Veterans Affairs, 510 F. App'x 827, 830 (11th Cir. 2013) ("assuming the equivalence of § 2000e-3(a) and § 2000e-16"); Walker v. Johnson, 798 F.3d 1085, 1091 (D.C. Cir. 2015) ("Title VII prohibits the federal government from . . . retaliating against [employees] because they opposed an unlawful employment practice or made a charge under the statute." (citing 42 U.S.C. §§ 2000e-16(a), 2000e-3(a))).

The Supreme Court's studied silence on this specific issue does not overturn those decisions. And though it has remained silent, the Court has at least acknowledged that "the federal-sector provision of Title VII does incorporate a remedial provision, § 2000e-5(g)(2)(A), that authorizes relief for a violation of § 2000e-3(a)." Gómez-Perez v. Potter, 553 U.S. 474, 488 n.4 (2008).

Both this court and the parties, including the defendant, operated under the same assumption over the course of this action. The defendant did not contest the application of § 2000e-3(a) to claims brought against the federal government at any time before filing this motion. If this is the USAO's strongest argument, as its position as the first argument raised in the defendant's memorandum would suggest, it would have been wiser to raise it in motions to dismiss, for summary judgment, or under Rule 50 at trial. The USAO might even have objected to

27

the court instructing the jury at all on retaliation.  The USAO did none of these things.

To the contrary, the defendant acted on the same assumption at both summary judgement and trial.  For example, it invoked § 2000e-3(a) in moving for summary judgment, arguing that Reyes engaged in neither participation nor opposition activity prior to his first EEO complaint in November 2013.[51]  In a pretrial motion, the USAO invoked § 2000e-3(a), rather than § 2000e-16(a), when previewing its anticipated Rule 50 motion.[52]  The defendant's own proposed jury instructions assumed the viability of retaliation claims by federal employees, setting out the requirements for such a claim to include retaliation for engaging in a "protected activity."[53]  Finally, the defendant never objected to the court's proposed jury instruction on the grounds that it was based on § 2000e-3(a).  Failure to make "timely, appropriately specific objection to the district court's jury instructions" is "treated as a procedural default,

---

[51] Mem. in Supp. of Summary Judgment Mot. (doc. no. 56-1) at 27-30.

[52] Defendant's Anticipated Rule 50 Mot. (doc. no. 195) at 2.  As discussed supra, it is this court's practice to permit, but not require, parties to submit ex parte proposed motions for judgment as a matter of law before trial to highlight for the court the legal and evidentiary strengths and weaknesses of the case.  The parties then exchange these memoranda after the plaintiff's case in chief.

[53] Defendant's Proposed Jury Inst. (doc. no. 110) at 16-21.

with the result that the jury instructions, even if erroneous, become the law of that particular case." Moore v. Murphy, 47 F.3d 8, 11 (1st Cir. 1995).

In short, the USAO raises, in post-trial briefing, an argument that it never raised in its motion to dismiss, its motion for summary judgment, or at any other point before or during trial, and -- perhaps most importantly -- that runs counter to the assumption or express holding of every court of appeals, including this Circuit's. In doing so, the USAO fails to cite a single decision in which this argument prevails. The court is, thus, disinclined to grant a new trial or judgment as a matter of law on this basis.

### 2. "Perception theory" under § 2000e-3(a)

Nor is the defendant entitled to judgment as a matter of law or a new trial under § 2000e-3(a), assuming that its anti-retaliation provisions do apply to government employees, as this court does (and the defendant did, until this motion). Those provisions prohibit employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). Reyes did not allege that, through his conduct in

February 2012, he <u>directly</u> opposed any unlawful practice.[54]  This is because, as he admitted at trial, he was not aware at the time that he obtained the ballistic vest that AUSA Mestey had filed an EEO complaint.  Reyes did not become aware of that complaint until, at the very earliest, FAUSA Domínguez chastened him on February 14, 2012, for supplying the vest to AUSA Mestey.  So he could not have, at the time he acquired the vest or at any time leading up to that February 14, 2012 meeting where he was scolded for supplying it, believed he was supporting that complaint or opposing any retaliation or discrimination against AUSA Mestey on its basis.  Rather, Reyes contended that, despite his lack of requisite knowledge and direct oppositional activity, his supervisors <u>perceived</u> his provision of the vest to AUSA Mestey as support for her EEO complaint and opposition to the way she and certain other employees were treated in the USAO.

The USAO now moves for judgment as a matter of law that Reyes's action did not constitute protected activity or a new

_____

[54] Reyes attempted to add an argument based on direct opposition to his case during oral argument on the defendant's motion for summary judgment.  Concluding, among other things, that Reyes had neither pleaded this basis for relief nor argued it in his summary judgment memoranda, the court rejected that attempt.  See Summary Judgment Hrg. Tr. (doc. no. 119) at 3-9.  The court likewise rejected Reyes's attempt to resurrect this argument at trial. See May 30, 2018 Tr. at 5-9.

30

trial in light of the court's jury instruction.  Specifically, it argues that (1) the statutory text does not support the perception theory, and (2) the First Circuit Court of Appeals has not expressly adopted this "perception theory" of retaliation in the Title VII context.[55]  Neither argument compels the USAO's desired result.

First, the language of § 2000e-3(a) supports instructing the jury on the perception theory.  See In re BankVest Capital Corp., 360 F.3d 291, 296 (1st Cir. 2004) ("As in any statutory interpretation case, we start with the text of the statute.").  That section renders it an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ."  42 U.S.C. § 2000e-3(a).  The

---

[55] Defendant's Mem. (doc. no. 237) at 7-12.  The defendant also argues, perfunctorily, that instructing the jury on the perception theory "would dramatically expand Title VII liability against the government" in contravention of the principle that "[w]aivers of sovereign immunity must be narrowly construed." Defendant's Mem. (doc. no. 237) at 10.  The defendant never raised that argument before or during trial and does so now without fully developing it.  So, in addition to being both waived and insufficiently developed, insofar as it turns on federal-sector Title VII as "constitut[ing] a limited waiver of sovereign immunity," id., this argument is inapposite for the reasons discussed supra Part III.A.1.

31

defendant emphasizes the language concerning the actions taken by the employee — that is, the language "he has opposed" and "he has made . . . or participated."  This language, the defendant suggests, requires the plaintiff to have actually engaged in the listed behavior.[56]

In doing so, however, the defendant too narrowly defines the causal element of a retaliation claim.  Title VII renders it illegal for an employer to "discriminate against any of his employees . . . because" that employee engaged in protected activity.  42 U.S.C. § 2000e-3(a).  Claims under this statute therefore "require proof that the desire to retaliate was the but-for cause of the challenged employment action."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013).  The provision focuses on the intent of the employer.  That intent may exist, even if the employee never took the protected action, so long as the employer perceived him as having done so.

The Third Circuit Court of Appeals employed similar reasoning in addressing this argument under the anti-retaliation provision of the Americans with Disabilities Act, which is substantively and linguistically almost identical with Title VII's.[57]  Relying on the statute's plain language, and

---

[56] Defendant's Mem. (doc. no. 237) at 8-9.

[57] The defendant argues that this ADA-based case is inapposite because "the ADA contains text that arguably supports the

analogizing to Title VII, it held that, where a plaintiff "can show . . . that adverse action was taken against him because [the defendant] thought that he was . . . engaging in protected activity, it does not matter whether [the defendant's] perception was factually correct."  Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 571 (3d Cir. 2002).  Specifically, the ADA renders it illegal for an employer to "discriminate against any individual because such individual" engaged in protected activity.  42 U.S.C. § 12203.  The Third Circuit Court of Appeals determined that "discrimination," in this context, "refers to the practice of making a decision based on a certain criterion, and therefore focuses on the decisionmaker's

---

perception theory" in that it "specifically prohibits discrimination or retaliation on the basis that an employer 'perceives' that an employee has an ADA-qualifying disability." Defendant's Mem. (doc. no. 237) at 8-9 (citing 42 U.S.C. § 12102(3)).  The ADA does define "disability" to mean, among other things, "being regarded as having" a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(3)(C).  But its anti-retaliation provision does not use the term "disability"; like Title VII's, it addresses discrimination for engagement in protected activity.  See 42 U.S.C. § 12203(a).

That definition therefore has no bearing on interpretation of the anti-retaliation provision.  Rather, the text of the ADA's and Title VII's anti-retaliation provisions is sufficiently similar that they are analyzed under the same legal framework. See Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013) ("A retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII.").

subjective intent." Fogleman, 283 F.3d at 571. And "the word 'because' specifies the criterion that the employer is prohibited from using as a basis for decisionmaking." Id. "The laws, therefore, focus on the employer's subjective reasons for taking adverse action against an employee, so it matters not whether the reasons behind the employer's discriminatory animus are actually correct as a factual matter." Id.

The Supreme Court's holding with respect to retaliation for First-Amendment activity in Heffernan v. City of Paterson, 136 S.Ct. 1412 (2016) further supports this interpretation. In that case, a police officer was demoted after his supervisors mistakenly perceived him as supporting a mayoral candidate that they disfavored. Id. at 1416. Addressing a retaliation claim under 42 U.S.C. § 1983, the Court focused on "the government's reason for demoting Heffernan" and held that an "employee is entitled to challenge" a demotion for engaging in protected political activity "even if . . . the employer makes a factual mistake about the employee's behavior." Heffernan, 136 S.Ct. at 1418. Title VII similarly prohibits an employer from retaliating against an employee for enumerated reasons. And an employer's factual mistake about the employee's behavior does not alter the negative effect of the employer's retaliation on the employee.

34

Several district courts have drawn the same conclusion with respect to Title VII retaliation.  See, e.g., Braddock v. SEPTA, No. CV 13-6171, 2016 WL 1182098, at *4 (E.D. Pa. Mar. 28, 2016) (denying summary judgment on perception theory claim); Cason v. S.C. State Ports Auth., No. CIV.A. 2:11-2241-RMG, 2014 WL 588031, at *11 (D.S.C. Jan. 7, 2014), report and recommendation adopted as modified, No. 2:11-CV-2241-RMG, 2014 WL 588065 (D.S.C. Feb. 14, 2014) (denying motion for summary judgment on perception-based Title VII retaliation claim); Johnson v. Napolitano, 686 F. Supp. 2d 32, 36 (D.D.C. 2010) ("A perception theory of retaliation does not rest on whether the employee actually asserts participation in a protected activity; rather, the theory applies so long as the employer believed that the employee was engaged in protected activity."); Grosso v. City Univ. of New York, No. 03 CIV. 2619NRB, 2005 WL 627644, at *3 (S.D.N.Y. Mar. 16, 2005) ("[W]e find that the language of 42 U.S.C. § 2000e-3(a) is consistent with the 'perception theory' of retaliatory discrimination.").

Though some courts have sidestepped the question, the defendant cites no authority expressly rejecting this perception theory of retaliation.  As the defendant observes,[58] the Fifth and Eleventh Circuit Courts of Appeals have not adopted the

---

[58] Defendant's Mem. (doc. no. 237) at 9.

perception theory.  See Carter v. Columbia Cty., 597 F. App'x 574, 580 (11th Cir. 2014) ("We have not adopted the perception theory of retaliation" under Title VII"); McKinney v. Bolivar Med. Ctr., 341 F. App'x 80, 83 (5th Cir. 2009) ("the Fifth Circuit has not adopted this perception theory of retaliation"). Neither of those unpublished opinions confronted the theory directly, however, turning instead on a lack of evidence that the employer believed the employee to be engaged in protected activity.  See Carter, 597 F. App'x at 580; McKinney, 341 F. App'x at 83.  The Tenth Circuit Court of Appeals has, more recently, affirmed a magistrate judge's decision not to instruct on the perception theory for a variety of reasons.  McDonald v. City of Wichita, Kansas, 735 F. App'x 529, 532 (10th Cir. 2018). That decision, which issued the day after the jury returned its verdict in this case, likewise neither adopts nor rejects the perception theory.

Of course, the defendant's motion hangs on the fact that the First Circuit Court of Appeals, also, has not adopted the perception theory.  Nor has it rejected it.  It has not addressed the theory at all.  Because the perception theory comports with the plain language of the statute and no court has affirmatively rejected it, this court finds the Third Circuit

36

Court of Appeals's reasoning in Fogleman and the Supreme Court's in Heffernan persuasive and denies the defendant's motion.[59]

### 3. Temporal proximity

Finally, the USAO argues that, even under the perception theory, it was entitled to judgment as a matter of law because the plaintiff failed to prove an element of his claim — specifically, a causal connection between his managers' perception that he engaged in protected activity and their retaliation. To satisfy the causation element of a Title VII

---

[59] Having been instructed on the perception theory, the jury concluded that "Mr. Reyes's supervisors perceived him as engaging in protected activity when he procured a ballistic vest for AUSA Mestey in February 2012." Verdict (doc. no. 222) at 1. The defendant does not argue that the evidence weighs against the jury's decision. See May 29, 2018 Tr. at 111-12; see also Defendant's Mem. (doc. no. 237). Though averring perfunctorily to this argument in the pre-trial memorandum, Defendant's Anticipated Rule 50 Mot. (doc. no. 195) at 5, the defendant neither developed it in that memorandum nor reiterated it upon moving for judgment as a matter of law at the close of the plaintiff's case, after evidence concluded, or in its post-trial motion, thus waiving it. See Full Spectrum, 858 F.3d at 674.

The defendant suggests in a footnote that the instruction may have confused or misled the jury because it "oscillated between different standards . . . that would trigger the application of the perception theory." Defendant's Mem. (doc. no. 237) at 11 n.2. Though the USAO objected, generally, to a perception-theory instruction, it never objected to the specific text of the instruction based on this newly-stated argument that it somehow "oscillated" in a confusing or misleading way, and thus waived this argument. See Moore, 47 F.3d at 11. Even if it had objected, it failed to develop this argument by explaining how the instruction may have confused the jury, thus waiving the argument anew. See U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

retaliation claim, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Nassar, 570 U.S. at 362. "'Very close' temporal proximity between protected activity and an adverse employment action can satisfy" this burden. Sánchez-Rodríguez v. AT&T Mobility Puerto Rico, Inc., 673 F.3d 1, 15 (1st Cir. 2012); see also Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) ("mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" may suffice as evidence of causality when the temporal proximity is "very close"). The defendant argues that any allegedly retaliatory actions taken against Reyes after the ballistics-vest incident were too remote in time to be causally connected to his perceived protected activity.

### a) Verdict form

As an initial matter, the defendant's temporal-proximity challenge leaves the court unequipped to provide the relief sought because, based on the structure of the verdict form requested by the defendant[60] and ultimately employed, there is no way to determine whether the jury found retaliation connected to that first instance of perceived opposition conduct (the

---

[60] See Defendant's Proposed Special Verdict Questions (doc. no. 219).

38

ballistic vest incident).  That is, because the jury was not required to make specific <u>retaliation</u> related findings — as it was with respect to specific protected-conduct events — the jury made no (and the defendant requested no) finding of retaliation associated with the perceived ballistic vest opposition conduct.

Specifically, while the defendant challenges the temporal connection between any retaliation and the ballistic vest incident, he does not challenge the temporal connection between any retaliatory action following the plaintiff's EEO complaints. The jury may therefore have found retaliation after, and awarded damages for, any of one, two, or three episodes or retaliatory conduct connected with any of one, two, or three instances of protective conduct.  It therefore may be that the jury agreed with the defendant's position and found insufficient evidence of retaliation after the first instance of perceived protected conduct.  But there is no way of making that determination, and the responsibility for the lies at the defendant's feet, based on its failure to request specific factual findings on the retaliation element, as it had requested with respect to the protected conduct element.[61]

---

[61] <u>See</u> <u>id.</u>

39

### b)   Sufficient temporal proximity

Even were the argument not rendered moot by the verdict form — that is, even if the jury did find retaliation based on Reyes's perceived protected activity — evidence in the record supports the jury's verdict.  As the defendant points out, certain concrete instances of allegedly retaliatory conduct occurred further in time from the February 2012 ballistics-vest incident, such as the letter of reprimand issued to Reyes some 15 months after the February 2012 meeting.[62]  But Reyes did not allege that each individual instance of conduct constituted stand-alone retaliation.  He premised his claim on the creation of a retaliatory hostile work environment.  And, viewed as it must be in the light most favorable to the jury's verdict, the evidence demonstrates sufficient temporal proximity between the perceived protected conduct and a course of conduct from which the jury could have concluded that Reyes's supervisors created a hostile work environment in retaliation for that conduct.

For example, Reyes presented evidence that he was subjected to increased supervision not long after the February 14, 2012 meeting.  After Reyes was scolded for providing the vest to AUSA Mestey and told that she had a complaint against the USAO, Reyes was subjected to increased scrutiny and reporting requirements.

---

[62] See Defendant's Mem. (doc. no. 237) at 18.

Specifically, in June 2012 one of Reyes's immediate supervisors, Lisa Western, began requiring him to obtain preapproval from USA Rodriguez to attend outside meetings on behalf of the office.[63]  She also started requiring him to provide a full briefing about those meetings.[64]  In discussing these requirements with USA Rodríguez, Western told USA Rodríguez, "I will be watching closely."[65]  Around this time, Reyes testified, Western also started requiring Reyes to submit weekly reports.[66]

In addition, Reyes's office was moved in mid- to late-2012 from the sixteenth floor — on which USA Rodriguez and other members of management kept their offices — to the fourteenth floor, near Western's office.[67]  USA Rodríguez testified that Western requested the move to make Reyes easier for her to find and supervise.[68]  But he was moved despite needing continued access to certain security-related equipment in his 16th-floor

---

[63] Trial Ex. 25 at D4455.

[64] Id.

[65] Id.

[66] May 23, 2018 Tr. at 116-17.

[67] Id.. at 23.

[68] May 22, 2018 Tr. at 129-30, 162.

office.[69] After his office was moved, Reyes testified, Western would regularly walk past his office without explanation.[70]

To the extent that any explanation was provided for these actions, it was his supervisor's observation, consistent with retaliation, that he must have upset someone in management and that his situation may improve in the future. That is, Western, his direct supervisor, observed that he "must have stepped on someone's toes," but that he should not "worry, this is a circle, [he was] on the down side but just keep going and [he would] be on the up side again."[71] Such testimony, which the jury may have credited, also supports the inference that Reyes's superiors retaliated against him and that his immediate supervisor recognized it.

Furthermore, these events occurred within a few months of the ballistics-vest incident, for which the plaintiff had been directly criticized by the U.S. Attorney for making AUSA Mestey appear to be a sympathetic victim, and while AUSA Mestey's EEO complaint remained pending, which may have rendered the plaintiff's perceived support even more irksome to management in the jury's eyes. While true that "three and four month periods

---

[69] Id. at 128-29; May 23, 2018 Tr. at 72-74.

[70] May 23, 2018 Tr. at 115.

[71] Id. Tr. at 117.

have been held insufficient to establish a causal connection based on temporal proximity," Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004), a five-month period has not, Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 25 (1st Cir. 2014). Furthermore, temporal proximity is "merely one factor relevant to causation . . . ." Garayalde-Rijos, 747 F.3d at 25. Where, as here, evidence exists from which a jury could conclude that Reyes's superiors began creating a hostile work environment within a few short months after perceiving him to engage in protected activity, the court will not disturb the jury's verdict.[72]

## B. Constructive discharge advisory verdict

The USAO next argues that it is entitled to judgment as a matter of law or a new trial because the court permitted the jury to render an advisory verdict on constructive discharge. The USAO now claims that this advisory verdict unfairly surprised it because it constituted a post-evidence reversal of a pre-trial ruling by the court that prejudiced the USAO's

---

[72] The defendant also suggests, for the first time in this litigation, that Reyes's "adverse action was untimely because . . . he failed to contact an EEO counselor within 45 days after receiving the letter of reprimand." Defendant's Mem. (doc. no. 237) at 12 n.3. Even had the defendant raised this argument in a timely fashion (i.e., under Rule 12 initially or, later, under Rule 56, or any other point before post-trial briefing), which it did not, the USAO waives the argument by failing to develop it. See Zannino, 895 F.2d at 17.

ability to present a complete defense.[73]  While true that the plaintiff had not brought a separate constructive discharge claim, he did claim that his supervisors created a hostile work environment that caused him to leave, and thus constructively discharged him from, the USAO.  The court has thus consistently concluded, throughout this litigation, that evidence concerning the circumstances of his departure from the USAO was relevant to his Title VII claim.  And because the court must decide whether Reyes is entitled to equitable remedies under that claim — including front pay and backpay — it permitted the jury to render an advisory verdict on constructive discharge.

As an initial matter, the defendant does not challenge the concept of advisory verdicts as unlawful or the use of them as erroneous per se.  Nor can he:  Federal Rule of Civil Procedure 39 permits the court, "[i]n an action not triable of right by a jury . . . on motion or on its own" to "try any issue with an advisory jury . . . ."  Because the constructive discharge verdict informs only the availability of equitable

---

[73] Defendant's Mem. (doc. no. 237) at 14-16.  It is the court's certain recollection that it raised the potential of an advisory verdict with counsel in chambers before the final day of evidence.  Because the record does not reflect this, however, the court assumes, for purposes of resolving this motion, that the issue was first raised at the charge conference, after evidence closed.

relief under Title VII, the advisory verdict in this case falls within those bounds.

Just as importantly, the USAO never objected on the record to this advisory verdict, its inclusion in the jury charge, or its inclusion in the verdict form, thus waiving this argument. See Putnam Resources v. Pateman, 958 F.2d 448, 456 (1st Cir. 1992) ("Silence after instructions, including instructions on the form of the verdict to be returned by the jury, typically constitutes a waiver of any objections."). Finally, even were the USAO's objection not waived by its failure to object or seek relief, the advisory verdict neither prejudiced nor should have surprised it. Accordingly, its motion for a new trial or judgment as a matter of law on this issue is denied.

### 1.   Constructive discharge in this litigation

The USAO cannot now claim surprise because Reyes's allegations concerning constructive discharge, as part of his retaliation claim, have consistently been a part of this action since its inception. Though Reyes did not plead it as a separate count or claim, he alleged in the complaint that he was constructively discharged in retaliation for his protected activity.[74] That is, he pleaded that he "alleges constructive discharge. The harassing and retaliatory actions by management

---

[74] See Compl. (doc. no. 1) ¶¶ 1.8, 17.30, 17.34.

45

reached such an intensity by early February, 2003 and were so intolerable that it became clear to the plaintiff that management would do whatever it could to force him out of the office."[75]  As the court explained during the summary judgment proceedings, it "view[ed] the constructive discharge part of this case as simply part of the allegation of retaliatory conduct and adverse work action."[76]  Accordingly, the defendant was aware that constructive discharge was "on the table as far as triable issues were concerned," in the defendant's words,[77] as of August 18, 2017, some nine months before trial.  The defendant had ample opportunity to design its trial strategy accordingly.

The court's pretrial ruling on the defendant's motion <u>in limine</u> did not alter, and was fully consistent with, this position.  In that motion, the USAO did not — as it now represents — "move[ ] to preclude a jury instruction on constructive discharge."[78]  Rather, in light of the court's explanation during summary judgment proceedings, the USAO moved

---

[75] Id. ¶ 1.8.

[76] Summary Judgment Hrg. Tr. (doc. no. 119) at 14-16.

[77] See Defendant's Mem. (doc. no. 237) at 15.

[78] Id. at 20.  Though the court imputes no bad faith or ill motive to defendant's counsel, it is troubled by the defendant's less than accurate characterization of the relief sought by that motion and the court's order addressing it.

to "preclude evidence and argument on backpay and front pay," categories of damages that the jury may award Reyes only if he prevailed on a separate claim for constructive discharge.[79] That is the motion the court granted.[80] And the court never altered its position on that issue: Reyes was not permitted (indeed, did not seek) to present evidence concerning backpay and front pay. But the court made clear in that order that "the circumstances of [Reyes's] departure from the USAO relate to his claim under Title VII,"[81] leaving the defendant on notice that the plaintiff would be permitted to adduce evidence concerning those circumstances.

As the court further explained, however, backpay and front pay may yet be available in equity, and thus not subject to Title VII's statutory cap.[82] The court did not then, and still has not, determined whether such remedies are in fact available to Reyes. Because a plaintiff is "not entitled to a jury trial under [his] Title VII equitable claims," Ramos v. Roche Prod., Inc., 936 F.2d 43, 50 (1st Cir. 1991), it reserved the question

---

[79] See Defendant's Motion in Limine to Preclude Evidence and Argument on Backpay and Front Pay or, in the Alternative, Motion for Clarification ("Mot. in Limine") (doc. no. 128).

[80] Order on Mots. in Limine (doc. no. 168) at 31-33.

[81] Id. at 31.

[82] Id. at 32-33.

47

of their availability for post-trial briefing and, should it conclude that Reyes may in fact pursue them, the question of his entitlement to them for a post-trial hearing during which both sides would be permitted to present evidence to the court.[83] Neither this briefing nor this hearing have yet taken place.

The court's pretrial orders — that the circumstances of Reyes's departure were relevant to his Title VII claim, though he pleaded no separate constructive discharge claim, but that questions of backpay and front pay were a matter for the court, not the jury — were clear and consistent. If the defendant "designed his litigation strategy, shaped his theory of the case, presented his evidence and witnesses, made other critical decisions concerning the trial, and rested, all in reliance on" the assumption that those circumstances were "off the table as far as triable issues were concerned,"[84] that assumption was not reasonably based on any ruling by the court.

### 2.    Prejudice to the defendant

Even if the court's instruction on an advisory verdict for constructive discharge had been erroneous or unreasonably surprising, and even if the USAO had presented this argument by objecting to that instruction, it would not warrant a new trial.

---

[83] Id. at 33.

[84] Defendant's Mem. (doc. no. 237) at 14-15.

48

"An erroneous jury instruction warrants a new trial if the preserved error, based on a review of the entire record, can fairly be said to have prejudiced the objecting part. . . . Even if a jury instruction is erroneous, it must still cause prejudice to constitute reversible error." Thomas & Betts Corp. v. New Albertson's, Inc., 915 F.3d 36, 52 (1st Cir. 2019). The USAO has not, however, identified any prejudice that it suffered as a result of the court permitting an <u>advisory</u> verdict on constructive discharge.

The ultimate determination of whether Reyes is entitled to equitable relief in the form of backpay or front pay is a decision reserved for the court. Under such circumstances, an advisory verdict is, "as the name would suggest, purely advisory in nature; '[t]he responsibility for the decision-rendering process remains with the trial judge' and 'it is in its discretion whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury.'" United States v. Shields, 649 F.3d 78, 84 (1st Cir. 2011) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2335, at 354-56 (3d ed.2008)). The court has not adopted that verdict and, in any event — if it concludes that equitable relief is available to Reyes under Title VII — would only award such relief after affording both sides an opportunity to present

49

evidence on its appropriateness, including with respect to the circumstances surrounding Reyes's departure.

In asserting prejudice, the USAO raises two examples of evidence that it claims it would have elicited had it been aware that the court may seek an advisory verdict, but did not. First, the USAO claims that it "ultimately decided not to call a third-party witness who would have provided relevant and probative testimony on the lack of any constructive discharge," and who, specifically, "would have testified that Plaintiff had been planning his departure from the USAO since the fall of 2014, had been in discussions with another lawyer to open up a practice in Florida, and was excited about the prospect of practicing as a lawyer in that new enterprise."[85] Next, the USAO claims that it

> would have elicited additional testimony regarding Plaintiff's dream and goal of opening a law practice, his happiness working at the Social Security office, his acquisition of knowledge and skills from working at the Social Security office which he planned to put into use in his new law practice, the circumstances leading to his resignation, the voluntary nature of his decision, and the fact that he had been planning

---

[85] Defendant's Mem. (doc. no. 237) at 15. The USAO never explained, on the record, the reasons behind its decision not to call this third-party witness. The court understood it to have made that decision after the court, at the USAO's request, held a sealed voir dire proceeding on the preceding evening, and ruled that certain testimony, which the witness preferred not to make public, would constitute relevant grounds for cross-examination.

50

to start his private law practice for many, many months.[86]

But testimony on both of these subjects would have been relevant to Reyes's claims and the defendant's defenses even absent an advisory verdict. And as discussed supra, the defendant was on notice that the circumstances surrounding Reyes's departure were relevant to Reyes's Title VII claim. The court's prior orders consistently confirmed as much and nothing in those orders suggested otherwise. The USAO could therefore have put this evidence in at any time during the trial. Its failure to introduce this evidence resulted from its counsel's decision not to introduce it and not from any failure on the court's part to provide notice of its intention to seek an advisory verdict before the close of evidence.

Even if the USAO somehow became aware of that evidence's relevance only after learning of the proposed advisory verdict instruction or the special verdict form, it still failed to object or seek any form of relief upon so realizing, which precludes relief at this posture. See Wilson v. Mar. Overseas Corp., 150 F.3d 1, 6 (1st Cir. 1998) ("[s]ilence after instructions, including instructions on the form of the verdict

---

[86] Id. at 16.

to be returned by the jury, typically constitutes a waiver of any objections." (quoting Putnam Resources, 958 F.2d at 456)).

As explained supra, the court held an in-chambers charge conference during the afternoon of May 30, after the close of evidence but before the parties gave their closing arguments. During that conference, the court discussed with counsel the possibility of obtaining an advisory verdict on constructive discharge from the jury and the accompanying instructions. That evening, after the conference, the court emailed counsel, notifying them of its intention to obtain an advisory verdict and providing both the language from the verdict form and its instruction on that issue.[87]

The defendant was thus on notice of the issue well before the next morning, when counsel conducted closing arguments and the court instructed the jury. At any point during that time, the USAO could have objected to the proposed instruction and advisory verdict or moved to reopen evidence to present any of the testimony discussed above. It did neither of these.

The USAO did not do so, it suggests, because "the trial was virtually over but for closing arguments," and the judge may have found a continuance "impractical and inefficient."[88] It is

---

[87] See Defendant's Ex. B (doc. no. 237-2).

[88] Defendant's Mem. (doc. no. 237) at 16 n.7.

52

equally likely, however, that, as closing arguments had not yet begun, the court would have found the reopening of evidence to be more practical and efficient than a new trial.  The defendant's inaccurate, ex post facto speculation does not warrant judgment as a matter of law or a new trial.

### C.    Other employees' allegations

The third basis on which the defendant seeks judgment as a matter of law or a new trial is the admission of limited testimony by other employees of the USAO in Puerto Rico with employment-related claims pending against that office.  In advance of trial, the defendant moved to exclude evidence and argument concerning allegations of retaliation or discrimination experienced by three other employees of the USAO in Puerto Rico and asserted in four other lawsuits.[89]  The court granted that motion in part.[90]  Relevant to this motion, it excluded evidence from witnesses Carmen Márquez and Nelson Pérez-Sosa concerning their own allegations of retaliation or discrimination, including testimony concerning their employment lawsuits against the USAO, because that evidence lacked relevance to Reyes's

---

[89] Mot. in Limine (doc. no. 123).

[90] Order on Mots. in Limine (doc. no. 168) at 24-28.  The plaintiff agreed that he would "not attempt to introduce evidence" of two of those lawsuits.  Id. at 25 (quoting Plaintiff's Omnibus Obj. (doc. no. 148) at 4 n.1).

53

retaliation claim.[91]  Specifically, it excluded testimony

concerning:

> (1) a conclusory and general "pattern of retaliation
> and hostile work environment"; (2) the fact that
> [Márquez and Pérez], or other employees, have filed
> lawsuits or administrative complaints alleging
> retaliation or a hostile work environment; or (3) the
> fact that Márquez was ordered reinstated in her
> position following a successful employment action in
> 2008.[92]

At the same time, the Court of Appeals has acknowledged that

"evidence of a 'discriminatory atmosphere' may sometimes be

relevant to showing the corporate state-of-mind," though it can

be "too attenuated" to justify admission and "should be let in

sparingly."  Cummings v. Std. Register Co., 265 F.3d 56, 63 (1st

Cir. 2001).  The court therefore allowed Márquez and Pérez to

give testimony, limited in scope, concerning their own "support

of Reyes and any negative consequences experienced as a result

. . . ."[93]

The USAO does not challenge the court's original ruling

permitting some testimony by these witnesses on this subject.[94]

---

[91] Id.

[92] Id. at 28.  The plaintiff affirmatively represented that he would not attempt to introduce evidence of Márquez's 2005 lawsuit that resulted in her reinstatement.  Plaintiff's Omnibus Obj. (doc. no. 148) at 4 n.1.

[93] Order on Mots. in Limine (doc. no. 168) at 27.

[94] See Defendant's Mem. (doc. no. 237) at 16-21.

It argues, instead, that it is entitled to judgment as a matter of law or a new trial because (1) the court refined its ruling during the trial in light of the evidence as it was presented and (2) the plaintiff and his counsel violated the court's order. The court's mid-trial clarifications of its order (which, as discussed below, were presaged in that order) did not prejudice the USAO, as it contends, and the USAO failed to timely object to the plaintiff's initial violation or the court's limiting instruction following his counsel's violation. Accordingly, the USAO is not entitled to the relief requested on this basis.

### 1.    Mid-trial clarifications

As the court's order reminded the parties, its pre-trial evidentiary "rulings [were] made without prejudice to revisiting particular issues in response to circumstances that might arise during trial."[95] As the trial progressed and the plaintiff elicited testimony from Márquez and Pérez-Sosa, the evidence presented required the court to revisit its rulings on their testimony, generally to preclude irrelevant testimony prejudicial to the defendant. Specifically, the plaintiff's counsel began to elicit unnecessarily long and detailed narratives from Márquez about the consequences of what she

---

[95] Id. at 1.

perceived to be retaliation.[96]  The court allowed the plaintiff's

counsel to lead the witness so as to avoid unnecessary and

potentially prejudicial detail.[97]  That, unfortunately, did not

prevent the witness from straying into her own complaints

against the defendant.[98]  After reviewing the issue over a

recess, the court clarified its order with specific reference to

the plaintiff's written submissions under 28 C.F.R. § 16.23(c)

("Touhy statements"), for Márquez and Pérez-Sosa, emphasizing

its limitation of those individuals' testimony to very generic

statements concerning how they were treated in light of their

support for Reyes.[99]  Following that clarification, the court

consistently sustained the defendant's objections and directed

the plaintiff's counsel to avoid prohibited testimony through

the remainder of Márquez's testimony.[100]

The court further clarified its order with respect to

Pérez-Sosa's testimony the next morning, after holding a

chambers conference with counsel.  Specifically, it explained,

---

[96] E.g., May 21, 2018 Tr. at 83-85.

[97] E.g., id. at 90-92.

[98] E.g., id. at 93-95.  The court repeatedly informed plaintiff's counsel that the testimony she sought to elicit was unnecessarily detailed and contrary to the court's motion in limine order.  E.g., id. at 96-100.

[99] Id. at 102-03, 107-08.

[100] E.g., id. at 115-17, 121-22

with reference to the plaintiff's Touhy statement, that Pérez-Sosa would be permitted to "testify to his support for Mr. Reyes and that he suffered negative consequences but could not detail them."[101]  It prohibited details about the consequences because such details "under [Federal Rule of Evidence] 403 would be inadmissible" and to avoid "a classic trial within a trial."[102]  Though the defendant objected generally "to any of this testimony coming in,"[103] its counsel did not offer any specific objection or seek any relief at the time.[104]  Plaintiff's counsel generally abided by this clarification of the court's order when questioning Pérez-Sosa.[105]

The USAO argues that this refinement of the court's pretrial order prejudiced it by denying it an "opportunity to adequately cross-examine" these witnesses.[106]  Specifically, the

---

[101] May 22, 2018 Tr. at 4-5.

[102] Id. at 5.  To the extent that the USAO argues that this clarification with respect to Pérez-Sosa's testimony prejudiced its ability to cross-examine Márquez, see Defendant's Mem. (doc. no. 237) at 17-18 (quoting May 22, 2018 Tr. at 5), the court observes that it rendered this clarification after the defendant had finished cross-examining Márquez the day before, see May 21, 2018 Tr. at 137.  Thus, the defendant was able to cross-examine Márquez without such restriction.  See May 21, 2018 Tr. at 87.

[103] May 22, 2018 Tr. at 5.

[104] Id.

[105] Id. at 106.

[106] Defendant's Mem. (doc. no. 237) at 18.

USAO complains, it presented a "Hobson's choice" by allowing the witnesses to testify about unidentified "consequences" without further detail, which, the USAO suggests, precluded it from testing those consequences without "opening the door to a 'trial within a trial'" in violation of the court's order.[107]

First, the clarification about which the defendant complains addressed only Pérez-Sosa's testimony. It was made after Márquez completed her testimony and the defendant completed its cross examination.[108] The defendant does not cite, and the transcript does not reflect, any instance in which Márquez testified merely that she suffered a consequence, without elaborating — sometimes at unnecessarily great length — on the nature and circumstances of those consequences. Specifically, she testified that, after she was identified as one of Reyes's witnesses in connection with his EEO complaint,[109] (1) her supervisor refused her request to have cases reassigned or to receive assistance with certain cases;[110] (2) her

---

[107] May 22, 2018 Tr. at 5.

[108] Márquez testified on May 21. See May 21, 2018 Tr. at 123-53 (Márquez cross examination). The court refined its order in the manner about which the defendant complains on the morning of May 22. See May 22, 2018 Tr. at 5.

[109] May 21, 2018 Tr. at 82-83.

[110] Id. at 84-85.

productivity rating was lowered;[111] (3) she was charged sick leave while teleworking;[112] and (4) she was issued a letter of admonishment.[113]  The defendant was free to cross examine Márquez about whether those allegedly retaliatory actions were, in fact, retaliatory.  The court clearly informed the USAO's counsel that such cross examination was permissible.[114]

Pérez-Sosa, on the other hand, was merely allowed to testify that he "suffer[ed] serious consequences" after he was perceived as helping Reyes with his EEO complaint.[115]  But the USAO never objected to the course proposed by the court — it rendered only a general objection to allowing any testimony concerning Pérez-Sosa's allegations.[116]  It did not raise any potential prejudice to its cross examination or request any relief that the court may have afforded at the time, such as testing the witness outside the presence of the jury to

---

[111] Id. at 92-93.

[112] Id. at 93.

[113] Id. at 109-10.

[114] May 21, 2018 Tr. at 87 ("You can cross her.  If she said I was retaliated against for anything, you can cross examine her with her own statements . . . .  It is clear cross to say here, you allege here that you were retaliated against X, Y and Z, not for supporting Francisco.  That is basic.").

[115] May 22, 2018 Tr. at 106.

[116] Id. at 5.

determine how much questioning its counsel might engage in without opening the door. The USAO admits that its counsel's "fear of opening the door contrary to the Court's midtrial order" prevented them from eliciting testimony to rebut Pérez-Sosa's claim. But, in the middle of trial, the court cannot address fears not raised by counsel. The USAO is not entitled to a new trial when it makes assumptions, fails to seek relief, and then complains when relief was not granted.

Furthermore, even assuming that the USAO faced some prejudice based on Pérez-Sosa's single line of unelaborated testimony about consequences, it complains of a single question asked of a single witness. That the USAO was unable to explore the fact that Pérez-Sosa resigned instead of, as plaintiff's counsel previewed his testimony, being fired, is unlikely to have significantly impacted the jury's decision when weighed against the more direct evidence of retaliation against Reyes presented at trial. See, e.g., evidence discussed supra Part III.A.3.

### 2. Plaintiff's violations

The USAI also argues that the plaintiff's and his counsel's violations of the court's order excluding evidence of Márquez's former lawsuit and reinstatement entitle it to a new trial. The USAO's failure to object to the plaintiff's first violation, the

court's course of action to address the second violation, and its limiting instruction to the jury following plaintiff's counsel's violation precludes any such relief.

The plaintiff himself arguably violated the order excluding evidence of Márquez's prior suit and reinstatement in the context of explaining why he expressed his concerns with his supervisors' treatment to Márquez. He expressed his concerns to her, he testified, because she "won a lawsuit against the office and she was reinstated so [he] wanted to know what [he] was getting into."[117] The defendant did not object to this testimony. Some time later, Reyes testified rather less explicitly that "Carmen Marquez had gone through all of this before,"[118] and the defendant finally objected,[119] explaining that he "didn't object" the first time "because the cat was out of the bag."[120]

The court suggested a limiting instruction to the effect that "the fact that Carmen Marquez had a prior case does not make it any more likely this is a retaliatory conduct," but instead, at that time, permitted plaintiff's counsel to lead

---

[117] May 23, 2018 Tr. at 131.

[118] Id. at 164.

[119] Id. at 164.

[120] Id. at 165.

plaintiff to avoid further references to Márquez's lawsuit.[121] The defendant did not object to this course of action. And at no time during the remainder of the plaintiff's testimony did defendant affirmatively request a limiting instruction or any additional relief on this subject.

Plaintiff's counsel also injected Márquez's reinstatement into her closing argument.[122] The court did provide a limiting instruction at that time:

> [T]he fact that AUSA Marquez had a prior complaint, sued and has been reinstated does not make it any more or less likely that the defendant in this case retaliated against Francisco Reyes. You are not to consider it in that respect. Only in the context of the explanation that counsel is giving now in her closing. It is important that you remember this case is about the U.S. Attorney's office conduct with respect to Francisco Reyes and not with respect to Carmen Marquez.[123]

The plaintiff objected to that instruction; the defendant did not.[124]

The USAO now seeks judgment as a matter of law or a new trial with respect to this series of events. Specifically, it argues that the testimony and argumentation was prejudicial and that the limiting instruction was given too late and, rather

---

[121] Id. at 166–67.

[122] May 31, 2018 Tr. at 57.

[123] Id.

[124] Id.

than curing plaintiff's errors, may have served to solidify the forbidden testimony in the jurors' minds to its prejudice. Neither issue warrants relief.

First, the USAO's failure to object to the first injection of Márquez's prior suit into the record and its failure to object to the limiting instruction ultimately provided preclude the relief it seeks. "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). This rule "require[s] the objecting party to state its objections," including the specific bases for those objections, "after the charge but before the jury retires." Wilson, 150 F.3d at 6. Thus, "[s]ilence after jury instructions typically constitutes a waiver of any objections . . . ." Beatty v. Michael Bus. Machines Corp., 172 F.3d 117, 121 (1st Cir. 1999) (quotations omitted). "The object of this rule is to afford the trial judge an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge." Id. (quoting Marshall v. Nugent, 222 F.2d 604, 615 (1st Cir. 1955)).

As the defendant's counsel observed, "the cat was out of the bag" because he failed to object the first time that Reyes

63

violated the order.[125]  The second time that the plaintiff

testified concerning Márquez's prior lawsuit, though the

defendant's counsel finally objected, he did not affirmatively

request any form of relief.[126]  Specifically, he did not request

a limiting instruction (though the court did suggest it would

give one), an instruction that the jury disregard the testimony,

or that the offending testimony be stricken from the record.[127]

And the court ultimately provided a limiting instruction on the

issue during plaintiff's closing argument.[128]  The USAO did not

object to either the timing or the content of that instruction,

---

[125] May 23, 2018 Tr. at 165.

[126] See id. at 165-67.

[127] Id.

[128] The defendant also argues that the form of the limiting instruction itself increased, rather than decreased, its prejudice — specifically, that instruction characterized uncontroverted testimony as a "fact."  See May 31, 2018 Tr. at 57 ("[T]he fact that AUSA Marquez had a prior complaint, sued and has been reinstated does not make it any more or less likely that the defendant in this case retaliated against Francisco Reyes.  You are not to consider it in that respect.").  The court's use of the word "fact" was merely a linguistic construction designed to convey the substance of testimony, to which the defendant did not object, rather than to convey that any such fact had been proven.  The thrust of the court's instruction was to deemphasize that testimony.  That is, the court did not instruct the jury that they must take Márquez's former suit and reinstatement as a fact.  To the contrary, it cautioned them against considering that testimony when drawing the ultimately conclusion they were called upon to draw in this case.

64

thus depriving the court of an opportunity to cure any perceived error in that instruction.[129]

Courts "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." United States v. Pierre, 484 F.3d 75, 85 (1st Cir. 2007) (quoting Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987)). While "the usual presumption does not apply when there is an 'overwhelming probability' that the instruction will be ineffectual," Blake v. Pellegrino, 329 F.3d 43, 50 (1st Cir. 2003) (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)), the defendant has outlined no such probability here.

That the instruction was given during closing argument does not in and of itself render it overwhelmingly probable that the instruction would be ineffectual. It is, rather, more likely that a jury would follow an instruction given proximate to their

---

[129] See May 31, 2018 Tr. at 57. After the jury was discharged, the defendant's counsel did raise one issue with respect to plaintiff's counsel's statement during closing argument. He suggested that there had not been "testimony that [Márquez] had been reinstated." Id. at 72. The USAO identified no relief that it sought concerning the instruction and, in any event, contrary to its suggestion (and, admittedly, the court's contemporaneous recollection), id., there had been such testimony. See May 23, 2018 Tr. at 131. While that testimony, did not necessarily constitute "proof" of her reinstatement and the court could have, if requested, instructed the jury that no such "fact" had been proven at trial and not to consider the issue, she did testify that she was currently employed by the USAO and her reinstatement would be a reasonable inference.

deliberations than one rendered a week before, at the time of Reyes's testimony.  Finally, "[i]t is a well established tenet of our judicial system that juries are presumed to follow" instructions that "lawyers' arguments were not evidence." United States v. Gentles, 619 F.3d 75, 82 (1st Cir. 2010).  The court so instructed the jury twice — once before the trial began and once before dismissing the jury to deliberate.[130]

The cases cited by the defendant also do not support grant of a new trial under these circumstances.  In Carrier Corp. v. Goodman Glob., Inc., the court granted a new trial after counsel injected an unsupported inference about indemnification into closing argument.  162 F. Supp. 3d 345, 367 (D. Del. 2016).  The court had not, however, issued a curative instruction in that case.  Id.  And in Levitant v. City of New York Human Res. Admin., the court granted a new trial, in part because plaintiff's counsel made at least six improper statements during summation, including statements unsupported by record evidence, references to evidence excluded at trial, and conduct by the

---

[130] May 14, 2018 Tr. at 110 ("[A]rguments and questions by lawyers are not evidence."); May 31, 2018 Tr. at 2 (reading of final jury instructions); Final Jury Instructions (doc. no. 218) at 8 ("Arguments and statements by lawyers are not evidence. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.").

defendant not at issue.  914 F. Supp. 2d 281, 311 (E.D.N.Y. 2012).

Here, plaintiff's counsel made only one statement to which the defendant objected, and that statement was supported by evidence in the record -- evidence to which the defendant did not object until the issue came up a second time, well after the "cat was out of the bag."  And the court gave a limiting instruction immediately after counsel's error, to which the defendant did not object.  These statements, therefore, do not entitle the defendant to a new trial or judgment as a matter of law.

D.    National security exception

Finally, the USAO argues that it is entitled to judgment as a matter of law because an exception to Title VII precluded the jury from considering, as retaliatory acts, the FBI's restriction of Reyes from its spaces, and his supervisors' alleged initiation and enforcement of that restriction (if, in fact, it was imposed at their behest).  Under that provision, as relevant here,

> it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, [or] for an employer to discharge any individual from any position . . . if—
>
> (1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of

67

the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

(2) such individual has not fulfilled or has ceased to fulfill that requirement.

42 U.S.C. § 2000e-2(g). This section "creates a security exemption to Title VII where access is denied to a premise where secure information is kept." Toy v. Holder, 714 F.3d 881, 887 (5th Cir. 2013).

Analogizing this case to Toy, the defendant now argues that three actions allegedly taken by the USAO cannot be deemed retaliatory in light of this statute: (1) prompting the FBI to impose those restrictions, (2) enforcing those restrictions, and (3) refusing to allow Reyes to resume his intelligence specialist duties in light of those restrictions.[131] Interesting though these arguments may be, the USAO never raised this issue until after the plaintiff rested his case — that is, it was never raised at summary judgment, in any pre-trial motions practice, or at any point during the plaintiff's case. Even if the USAO had raised this issue in a timely manner, the national-security exception to Title VII, on its face, does not exclude the actions those taken by Reyes's supervisors.

---

[131] May 29, 2018 Tr. at 114, 116; Defendant's Mem. (doc. no. 237) at 22.

68

### 1. Timing of the argument

As an initial matter, the USAO contends that the court erred when it "refused to give the requested instruction" that "would have precluded the jury from imposing Title VII liability on Defendant for complying with the FBI's restrictions regarding Plaintiff's access to national security space and information . . . ."[132] The record does not, however, reflect that the defendant ever sought such an instruction — only that it sought judgment as a matter of law on that basis.[133] And the USAO never objected to the jury instructions on the basis that they did not instruct the jury to disregard all of this evidence or that the national-security exception removed the FBI's restrictions, and Reyes's supervisors actions in response, from the realm of potentially retaliatory conduct.

The USAO has maintained since at least the summary judgment stage that the FBI's restriction of Reyes from its spaces

---

[132] Defendant's Mem. (doc. no. 237) at 21-22.

[133] See May 29, 2018 Tr. at 111-117. The court sua sponte contemplated the contours of such an instruction, should it grant the defendant's Rule 50 motion. See May 30 Tr. at 116-117. But it did not grant the motion; so it did not provide an instruction. And this is not a distinction without a difference. When the court did not grant its motion under Rule 50, the USAO could have requested that the jury not consider the evidence in question. Despite claiming to have requested an instruction, see Defendant's Mem. (doc. no. 237) at 21-22, he did not.

69

mandated that he be given alternative duties[134] and precluded USA Rodríguez from returning his intelligence specialist duties when Reyes made the request in January 2015.[135]  That is, the FBI's investigation and restriction formed the basis for the defendant's alternative explanation for actions by Reyes's supervisors that Reyes alleged constituted part of the retaliatory hostile work environment.

Based on that position, the USAO affirmatively represented at the final pretrial conference that it would not seek to exclude evidence of the FBI's investigation of Reyes.[136]  And, as trial proceeded, both parties elicited information concerning the FBI's restrictions on Reyes's access to their spaces and the actions taken by Reyes's superiors in light of those

---

[134] E.g., May 22, 2018 Tr. at 66 ("We had to find other duties for Mr. Reyes to perform because he could not perform his intelligence analyst specialist duties given the restrictions imposed by the FBI."); id. at 244-46 (explaining duties assigned Reyes because of the restriction).

[135] See Summary Judgment Hearing Tr. (doc. no. 118) at 26-27; see also Trial Ex. 115; May 18, 2018 Tr. at 135 (defendant citing FBI restrictions as reason for not reinstating Reyes in opening statement); May 22, 2018 Tr. at 41-43, 46; May 23, 2018 Tr. at 194-97.

[136] See also Defendant's Notice Regarding Certain Limitations on the Testimony of FBI Witnesses Ex. 1 (doc. no. 169-1) at Ex. A ¶¶ 5-8, Ex. B ¶¶ 6-8 (defendant's Touhy statements for FBI witnesses, permitting them to testify concerning certain aspects of FBI restrictions on Reyes's "access to FBI space and FBI information").

restrictions.  The USAO did not object to or seek any limitations on this evidence.

The USAO did not raise the national-security exception at all until the next-to-last day of evidence, after the majority of that evidence was heard and the plaintiff rested his case.[137] At that point, nine days into the eleven-day trial, defendant's counsel admitted that the argument occurred to him, for the first time, over the weekend recess that occurred immediately before his cross examination of the plaintiff.[138]  Though his explanation for not raising the issue earlier in the trial was understandable, given that it was never raised at summary judgment or in the extensive pretrial motion practice resulting in a 36-page order on nine separate evidentiary motions, but it was insufficient.

### 2.    Interpretation of § 2000e-2(g)

Even if the USAO had timely raised the national-security exception, it does not support the instruction the USAO claims it requested.  As described supra, on its face, § 2000e-2(g) exempts from Title VII's definition of "unlawful employment practices" an employer's (1) "fail[ure] or refus[al] to hire and employ any individual" or (2) "discharge [of] any individual

---

[137] See May 29, 2018 Tr. at 111-12.

[138] Id. at 111.

from any position" if the position requires access to premises that require certain security clearances and the individual lacks those clearances.  42 U.S.C. § 2000e-2(g).

The security exception does not apply here because none of the three actions taken by Reyes's superiors in light of the FBI's restrictions fall within the employment actions contemplated by the statute.  The plaintiff never argued, nor presented evidence, that his supervisors failed or refused to hire him in light of the FBI restrictions.  Nor is there any evidence that his supervisors discharged him from his position. The defendant, in fact, argued that the plaintiff was never discharged from employment and that his position and pay were never altered.  The evidence is consistent that he retained both the title and salary of an intelligence specialist throughout his tenure at the USAO, even when he was given alternative assignments.[139]

The defendant now argues that an interpretation of this exception that applies it solely to hiring and firing decisions is too narrow and contrary to (1) the EEOC's own interpretation, (2) congressional intent, and (3) "common sense."[140]  None of these arguments alters the plain-text meaning of the statute.

_____

[139] See Stipulated Facts (doc. no. 194) ¶ 15.

[140] Id. at 24-25.

72

First, citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), the defendant contends for the first time (he did not raise this argument at trial) that the court should have deferred to the Equal Employment Opportunity Commission's (EEOC) interpretation of the provision.  Under Chevron, though, the court only defers to an agency's reasonable interpretation of a statute it administers "when the statute is silent or ambiguous." Neighborhood Ass'n Of The Back Bay, Inc. v. Fed. Transit Admin., 463 F.3d 50, 59 (1st Cir. 2006).  Here, the statute is neither. It expressly limits the national security exception to hiring and firing decisions.

Furthermore, "[d]eference in accordance with Chevron . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" Gonzales v. Oregon, 546 U.S. 243, 258 (2006) (citing United States v. Mead Corp., 533 U.S. 218, 226–227 (2001)).  With respect to Title VII, Congress has delegated authority to the EEOC to adopt only "suitable procedural regulations to carry out" its provisions, 42 U.S.C. § 2000e-12(a), not to issue substantive regulations, see Edelman v. Lynchburg Coll., 535 U.S. 106, 113 (2002) (acknowledging that "the EEOC has no

73

rulemaking power" over substantive issues).  It would thus be improper under Mead to import, from the EEOC's guidelines, an interpretation of the statute that broadens its scope in a substantive way.  This perhaps explains why the defendant has not cited, and the court has not found, any decisional authority giving Chevron deference to the EEOC regulations cited by the defendant.

Though not entitled to Chevron deference, "the EEOC guidelines constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Pérez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 26 n.9 (1st Cir. 2011) (quotation omitted).  As a matter of pure practicability, however, those guidelines cannot serve even that function when they are not raised.  The defendant now argues that the court erred by failing to defer to authority that the defendant never cited before or during the trial, despite full summary-judgment litigation and motions-in-limine practice.  It is unclear to the court just how the defendant intended it to defer, at trial, to authority that went unraised until some four months after trial.

Even were the EEOC's regulations timely raised, the language that the defendant selectively quotes from the EEOC's Title VII regulations provides no more guidance than the clear statutory language.  In providing guidance on national-origin

74

discrimination under 42 U.S.C. § 2000e-2(a), the EEOC has explained that "[i]t is not an unlawful employment practice to deny employment opportunities to any individual who does not fulfill the national security requirements stated in section 703(g) of title VII." 29 C.F.R. § 1606.3. The EEOC neither defines nor elaborates on the meaning of "employment opportunities," however, which may arguably encompass some broader set of employment-related actions than those expressly listed in 42 U.S.C. § 2000e-2(g). But without definition, it is at best unclear whether they would encompass allegedly using restricted access to create a hostile work environment.

Nor do the EEOC guidelines selectively quoted by the defendant include any such clarifying guidance with respect to any other form of discrimination under 42 U.S.C. § 2000e-2(a) or retaliation under 42 U.S.C. § 2000e-16(a). Separately, in discussing religious accommodations, the EEOC has provided examples of "employment opportunities," including "compensation, terms, conditions, or privileges of employment." 29 C.F.R. § 1605.2(c)(2)(ii). But there is no indication that this list of examples in any way refers to the EEOC's interpretation (if any) of 42 U.S.C. § 2000e-2(g). The defendant thus asks the court, well after trial, to ignore the statute's specific language and cobble together a broader and more ambiguous

75

interpretation drawn from separate, unrelated sections of EEOC procedural regulation.  It declines to do so.[141]

## IV.  Conclusion

The court is troubled by the bevy of arguments that the defendant raises in this motion that run contrary to positions taken by the defendant throughout this litigation or that charge the court with error for not affording the defendant relief that the defendant never requested during trial.  The defendant's post-trial insights, though interesting, do not warrant either judgment as a matter of law or a new trial.  The defendant's motion for both[142] is, accordingly, DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:    April 25, 2019

cc:  Bamily Lopez-Ortiz, Esq.
     Jason C. Weida, AUSA
     Susan M. Poswistilo, AUSA

---

[141] Neither "congressional intent" nor "common sense," see Defendant's Mem. (doc. no. 237) at 24-25, compel a different result where the statutory language is clear on its face.  The defendant, of course, did not raise these arguments at any time before or during trial.  In fact, though the defendant never raised the legislative history of this provision, the plaintiff did, briefly, in support of his position that it the exception applies only to limitations imposed by the lack of security clearance.  See May 30, 2018 Tr. at 108-10.

[142] Document no. 236.